A. Leland **BOLIN**, et al., Plaintiffs,

v.

The **CESSNA AIRCRAFT COMPANY**, Defendant,

**United States of America, Intervenor.**

Civ. A. No. 87–1338–T.

United States District Court,
D. Kansas.

March 6, 1991.

694

Randall K. Rathbun, Depew, Gillen & Rathbun, Wichita, Kan., for plaintiffs.

Jay F. Fowler, Douglas L. Stanley, Mikel L. Stout, Foulston & Siefkin, Wichita, Kan., for defendant.

Lee Thompson, U.S. Atty's. Office, Wichita, Kan., Stuart M. Gerson, Surell Brady, Charles W. Sorenson, Jr., Dept. of Justice, Civil Div., Washington, D.C., for intervenor.

## MEMORANDUM AND ORDER

THEIS, Senior District Judge.

This matter is before the court on the motion of defendant for partial summary judgment. (Doc. 86). In this private action between non-diverse parties, plaintiffs allege claims under the Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA"), 42 U.S.C. §§ 9601, *et seq.*, as well as several pendent claims based on state law. Defendant presents three grounds in support of partial summary judgment, including the contention that all pendent state claims are barred by the relevant Kansas statute of limitation, and that application of a contrary federal commencement statute to these claims is an unconstitutional extension of the commerce clause power as well as a violation of the tenth amendment to the United States Constitution. Pursuant to 28 U.S.C. § 2403(a), the court previously certified to the Attorney General that defendant has challenged the constitutionality of the federal statute in question. The United States has intervened for the limited purpose of defending this statute against the constitutional attack.

## I. *Background*

Plaintiffs in this action are individual homeowners and their adult children,[1] who contend that defendant has contaminated their groundwater supply with trichloroethylene ("TCE"), a solvent that the Environmental Protection Agency has determined is a probable human carcinogen.

Since 1951 defendant has owned and operated an aircraft manufacturing plant located a mile or less from the community where plaintiffs reside. In May 1985 defendant was notified by the Kansas Department of Health and Environment ("KDHE") that TCE had been detected in a sample of water taken from one of defendant's wells. Defendant had been using TCE at the plant since the 1950s. In late July 1985, KDHE informed at least some of the residents of the community that water samples taken from their wells had revealed TCE contamination. Some residents began transporting bottled water for cleaning and cooking purposes, and in the fall of 1985 the residents first petitioned the City of Wichita to connect their community to the city water mains and lines.

Throughout 1985 and 1986 tests were conducted by defendant and KDHE to determine both the extent of the TCE migration as well as the point sources of the contamination. Although defendant now admits that TCE has escaped from its property to plaintiffs' groundwater, defendant contends that until the late fall of 1986 it was unsure whether it had caused the TCE contamination of plaintiffs' groundwater. On October 28, 1986, KDHE issued a press release and published a notice to all residents living near defendant's plant, informing these residents that their groundwater had been contaminated. The notice advised that "[r]esidents in the area may wish to transport water from a public water supply for drinking and cooking purposes" or "to boil the water for ten minutes before drinking or cooking." Dep.Eht. 95. In December 1986, defendant made individual offers to 42 families and businesses to pay for the expense of connecting them to city water. For disputed reasons that are not material to this motion,[2] plaintiffs declined this offer

---

1. At present there are 40 named individuals, two of whom are also representing the estates of persons previously named. Eight of the plaintiffs are the adult children of these homeowners.

2. Defendant suggests that plaintiffs refused this offer "in an attempt to manufacture federal subject matter jurisdiction under CERCLA,...." Doc. 87, at 6. It might equally be claimed that

defendant made this offer in an attempt to defeat federal jurisdiction. Plaintiffs allege that defendant made this offer only after plaintiffs themselves had undertaken the lengthy and necessary negotiations with the city to connect the property to the city water, and that the terms of defendant's offer were unacceptable. In any event, the court considers the parties' motivations on this matter to be irrelevant to the

and themselves incurred the expense of connecting their property to the city water.

Plaintiffs filed this action on June 23, 1987, alleging subject matter jurisdiction under CERCLA. 42 U.S.C. § 9613; 28 U.S.C. § 1331. The CERCLA action is based upon the "response costs"[3] that plaintiffs have incurred by procuring an alternative source of water for their property. The state law causes of action alleged are negligence, trespass, intentional public and private nuisance, strict liability for ultrahazardous substances, and "wanton conduct." Plaintiffs claim compensatory damages in the form of diminished property value, out of pocket expenses, and "annoyance, discomfort, inconvenience and peace of mind (emotional distress)." Doc. 94, at 8. In addition, plaintiffs seek to recover punitive damages for conduct alleged to have been callous and indifferent to the health and safety of others.

Defendant moves for partial summary judgment on the grounds that: 1) all state claims are barred by the governing Kansas statute of limitation; 2) the court lacks subject matter jurisdiction over all claims of the eight plaintiffs who are adult children of the homeowners; 3) no plaintiff can recover damages for emotional distress.

## II. *Applicable Statute of Limitation*

Defendant contends that plaintiffs' state claims are barred under Kansas law, and that the Constitution prevents the court from reviving these claims under a concededly applicable federal limitations statute. In the interest of avoiding a potential-

ly unnecessary constitutional issue, *see, e.g., Jean v. Nelson,* 472 U.S. 846, 854, 105 S.Ct. 2992, 2996, 86 L.Ed.2d 664 (1985), the court first addresses plaintiffs' alternative argument disputing the untimeliness of their claims under Kansas law.

### A. Kansas Time Limitations

The parties recognize that plaintiffs' various state tort claims are governed by the Kansas two-year statute of limitation. Kan.Stat.Ann. § 60–513 (1983).[4] The difficulty with this case, however, is in determining the time at which plaintiffs' claims accrued.

The court is well-acquainted with the byzantine edifice of Kansas limitations law for actions alleging injury to real property. In *Miller v. Cudahy Co.,* 567 F.Supp. 892 (D.Kan.1983), *aff'd in part,* 858 F.2d 1449 (10th Cir.1988), *cert. denied,* 492 U.S. 926, 109 S.Ct. 3265, 106 L.Ed.2d 610 (1989), this court had occasion to review the Kansas cases that have struggled with the elusive task of determining the accrual of tort claims based on the pollution or contamination of land. *Id.* at 899–905. In making such determinations, Kansas draws a distinction between actions for permanent as opposed to temporary damages.

In an action for temporary damages, the tort is considered to be continuous, and a new cause of action accrues with each new injury. *Williams v. Amoco Prod. Co.,* 241 Kan. 102, 108, 734 P.2d 1113 (1987) (quoting *Gowing v. McCandless,* 219 Kan. 140, 144, 547 P.2d 338 (1976)). The plaintiff who seeks to recover temporary

conceded existence of a cognizable CERCLA claim.

**3.** Section 107 of CERCLA authorizes private actions against persons responsible for the release of hazardous substances into the environment and allows recovery of "any necessary costs of response incurred...." 42 U.S.C. § 9607(a)(4)(B). Among such "response costs" is the "removal action" of providing for "alternative water supplies," *id.* § 9601(23), which include "drinking water and household water supplies." *Id.* § 9601(34). *See Lutz v. Chromatex, Inc.,* 718 F.Supp. 413, 419 (M.D.Pa.1989) (reimbursement for costs of alternative, potable water supplies is appropriate response cost); *see generally infra* at 710–713. Liability under

CERCLA is strict, and the recovery of costs taken in response to a "release" or "threatened release" is available without regard to proof of an actual migration of hazardous substances from the defendant's facility. *Dedham Water Co. v. Cumberland Farms Dairy, Inc.,* 889 F.2d 1146, 1152–54 (1st Cir.1989).

**4.** Because this claim accrued before July 1, 1987, and was filed before July 1, 1989, the previous version of K.S.A. § 60–513 applies to this action. *See* K.S.A. § 60–513(d) (Supp. 1989); *Tomlinson v. Celotex Corp.,* 244 Kan. 474, 475, 770 P.2d 825 (1989) (applying previous version of K.S.A. § 60–513(b) to claim filed before July 1, 1989).

damages, however, may only recover for those damages that have accrued within two years of the date on which suit was filed. *See, e.g., Augustine v. Hinnen*, 201 Kan. 710, 711, 443 P.2d 354 (1968); *Miller*, 567 F.Supp. at 909. With respect to damages for decreased property value in an action for temporary damages, Kansas measures recovery by the depreciation of rental or other usable value during the period within the statute of limitation. *Alexander v. City of Arkansas City*, 193 Kan. 575, 580, 396 P.2d 311 (1964) (quoting 66 C.J.S. § 175).

By contrast, an action for permanent damages is generally deemed to accrue at the time that the fact of a substantial, actionable injury becomes reasonably ascertainable. *Williams*, 241 Kan. at 108, 734 P.2d 1113; *Olson v. State Highway Comm'n*, 235 Kan. 20, 26–27, 679 P.2d 167 (1984); *Roe v. Diefendorf*, 236 Kan. 218, 222, 689 P.2d 855 (1984) (injury is "substantial" within meaning of § 60–513(b) if sufficient to support an action). The nature of permanent damages was explained in *McAlister v. Atlantic Richfield Co.*, 233 Kan. 252, 662 P.2d 1203 (1983):

> Permanent damages are given on the theory that the cause of injury is fixed and that the property will always remain subject to that injury. Permanent damages are damages for the entire injury done—past, present, and prospective—and generally speaking those which are practically irremediable. If an injury is permanent in character, all the damages caused thereby, whether past, present, or prospective, must be recovered in single action.

*Id.* at 262, 662 P.2d at 1211 (citation omitted). "The measure of damages for permanent injury is the difference in the fair market value of the land before and after injury." *Williams*, 241 Kan. at 110, 734 P.2d 1113.

In determining whether an action for injury to land is to be considered as one for permanent or temporary damages, the Kansas cases have focused on three facets of the problem: 1) the pollution itself, 2) the damage caused by the pollution, and 3) the source of the pollution. *Miller*, 567 F.Supp. at 899–900; *see also Olson*, 235 Kan. at 24, 679 P.2d at 172. To the extent that the pollution itself or the damage caused by the pollution can be characterized as occasional, remediable, or abatable, the damage is temporary. *McAlister*, 233 Kan. at 262, 662 P.2d at 1211. As to the nature of the source of the pollution, relevant factors include the permanency of the polluting structure and whether the normal operations at the structure will necessarily create a continuous source of pollution. A pollution that is abatable at its source will tend to support an action for temporary rather than permanent damages. *See Gowing v. McCandless*, 219 Kan. 140, 145, 547 P.2d 338 (1976). Whether an action is deemed as one for temporary or permanent damages depends upon facts of each case. *Olson*, 235 Kan. at 24, 679 P.2d at 172.

In *Miller*, this court also observed that to a certain extent, plaintiffs enjoy the right to choose whether to pursue an action for temporary or permanent damages. 567 F.Supp. at 904 (citing *Augustine v. Hinnen*, 201 Kan. 710, 443 P.2d 354 (1968)). *See also McDaniel v. City of Cherryvale*, 91 Kan. 40, 43, 136 P. 899 (1913). This right is not unlimited, however, and must be a choice that is supportable under the facts of the case. *See Williams*, 241 Kan. at 108, 734 P.2d at 1119 (trial court ordered temporary action amended to permanent action); *McAlister*, 233 Kan. at 264, 662 P.2d at 1212; *McMullen v. Jennings*, 141 Kan. 420, 41 P.2d 753, syl. ¶ 5 (1935). Defendant contends that plaintiffs' action is for the permanent diminution in property value.[5] Plaintiff does not address the

---

**5.** Defendant draws this conclusion by selectively emphasizing only the form of damages sought by plaintiff. Similarly, the defendant in *Miller* sought to cast the case as one for permanent damages by focusing exclusively on the nature of the injury, rather than the source and nature of the pollution. But as the Tenth Circuit noted

in affirming this court's decision in *Miller*, the deficiency of such an approach is that it fails to give weight to all three aspects of actions involving damage to realty. *Miller v. Cudahy Co.*, 858 F.2d 1449, 1455 n. 7 (10th Cir.1988), *cert. denied*, 492 U.S. 926, 109 S.Ct. 3265, 106 L.Ed.2d 610 (1989).

question in terms of the permanent/temporary dichotomy, and the court will therefore assume for purposes of this motion that plaintiff has alleged, and could only allege, an action for the recovery of permanent damages. *Cf. Adams v. City of Arkansas City*, 188 Kan. 391, 362 P.2d 829 (1961) (construing claim for permanent damages to be one for temporary).

▮ An action for permanent damages to land generally accrues when the fact of a substantial injury becomes reasonably ascertainable. *Williams*, 241 Kan. at 108, 734 P.2d at 1119. This rule is derived from K.S.A. 60–513(b), which provides:

> Except as provided in subsection (c) of this section, the cause of action in this action [section] shall not be deemed to have accrued until the act giving rise to the cause of action first causes substantial injury, or, if the fact of injury is not reasonably ascertainable until some time after the initial act, then the period of limitation shall not commence until the fact of injury becomes reasonably ascertainable to the injured party, *but in no event shall the period be extended more than ten (10) years beyond the time of the act giving rise to the cause of action.*

(emphasis added). Plaintiffs argue that their claims did not accrue until the knowledge of TCE in their groundwater caused the decline in their property value and began to interfere with their enjoyment of the land. Be that as it may, plaintiffs' argument fails to confront the obstacle posed by the last clause of K.S.A. § 60–513(b), which creates a 10–year limitation for the time at which an action may be deemed to accrue. Despite the inability to discover an injury, Kansas does not allow a plaintiff to extend the two-year period of limitation more than 10 years "beyond the time of the act giving rise to the cause of action." In other words, a tort action does not accrue at all if it is not filed within 10 years of the time of the "act" referred to in the statute.

In *Tomlinson v. Celotex Corp.*, 244 Kan. 474, 770 P.2d 825 (1989), the court held that the word "act," wherever it appears in K.S.A. 60–513(b), refers to "the defendant's wrongful act, rather than the occurrence of a substantial injury." 244 Kan. at 481, 770 P.2d at 830. Thus, if defendant's allegedly wrongful act, resulting in a substantial injury to plaintiffs, took place more than 10 years before plaintiffs filed suit, any cause of action based on such wrongful act is barred. Under the statute, it is irrelevant whether plaintiffs did or even could have discovered the existence of a substantial injury within the 10–year period.[6]

Defendant contends that the wrongful act in this case is the "act" of "allowing TCE to escape from its facility on or before 1970."[7] Doc. 105, at 17. This emphasis on

In the present motion, defendant itself has cataloged various measures it has taken to implement what it describes as a "large-scale remediation project." Doc. 87, at 6. According to defendant, "[t]he system has been designed to prevent further contamination from reaching the plaintiffs' property and to clean up any existing contamination." *Id.* at 7. Adopting the scenario depicted by defendant would indicate that the contamination presently existing on plaintiffs' property is remediable, thus supporting an action for any temporary damages accruing within two years prior to the filing of suit. Moreover, because the release of TCE from the Cessna facility is presumably controllable and not a necessary condition of its operation, the contaminant is obviously abatable at its source. *See Miller*, 567 F.Supp. at 907. Nonetheless, the court concludes that the damages alleged by plaintiff are for a permanent injury, and that this choice of damages is supportable under the circumstances presented. *See generally Olson v. State Highway Comm'n*, 235 Kan. 20, 679 P.2d 167 (1984) (damages for permanent injury to real property of homeowner were permanent, notwithstanding abatability of the nuisance); *Mel Foster Co. v. American Oil Co.*, 427 N.W.2d 171, 174–75 (Iowa 1988); Glicksman, *A Guide to Kansas Common Law Actions Against Industrial Pollution Sources*, 33 Kan.L.Rev. 621, 653–67 (1985).

6. The full extent of the harshness of this rule was demonstrated under the facts of *Tomlinson*. There, a substantial injury resulting from plaintiff's exposure to asbestos did not even *exist* before expiration of the 10–year period. Yet the court held that the claim was barred.

7. It is unclear whether defendant refers to the release of TCE from its plant into its own property, or to the escape of TCE from its property onto plaintiffs' property. The court assumes the former for this portion of its discussion.

the time at which TCE escaped from its facility, however, finds no support in the two leading Kansas cases interpreting the 10–year provision of § 60–513(b). In *Tomlinson,* the court held that the 10–year limitation as applied to an action based on asbestos-related injuries "began, at the latest, upon the last exposure of the plaintiff to asbestos produced, sold, and distributed by the defendants in 1971." 244 Kan. at 481, 770 P.2d at 830. Although this language is somewhat ambiguous as to whether the date 1971 refers to plaintiff's exposure or to defendant's distribution,[8] no ambiguity exists regarding the relevant date on which the 10–year limitation began to run: "at the latest, upon the last exposure of the plaintiff to asbestos...." If defendant's argument had found favor in *Tomlinson,* the court would have referred to the dates on which the defendant in that case had introduced its dangerous product into the stream of commerce. *See also Lester v. Eli Lilly & Co.,* 698 F.Supp. 843, 844 (D.Kan.1988) (10–year limitation of K.S.A. § 60–513(b) began from time of mother's ingestion of DES), *aff'd mem.,* 893 F.2d 1340 (10th Cir.1990).

Any doubt on this issue is dispelled by *Ruthrauff v. Kensinger,* 214 Kan. 185, 519 P.2d 661 (1974), a case in which "[t]he ten-year limitation contained in K.S.A. § 60–513(b) received its most important interpretation...." *Tomlinson,* 244 Kan. at 476, 770 P.2d at 827. In *Ruthrauff* the court held that the 10–year limitation of § 60–513(b) "does not affect or limit the primary 2 year period for bringing an action where the fact of substantial injury is *immediately apparent* as in the case of an explosion and resulting fire." 214 Kan. at 191, 519 P.2d at 666 (emphasis added). The court reasoned that the 10–year provision limits only those types of injuries referred to in the immediately preceding clauses, which state:

> [I]f the fact of injury is not reasonably ascertainable until some time after *the initial act,* then the period of limitation shall not commence until the fact of injury becomes reasonably ascertainable to the injured party,....

K.S.A. § 60–513(b) (emphasis added). The court then found that plaintiff's injuries—which resulted from an explosion—were not of the variety referred to in these clauses because the fact of a substantial injury from the explosion was "immediately apparent." In other words, the court interpreted "the initial act" to refer not to the negligent construction of the house, but rather to the explosion, which coincided with the immediately apparent injury. As *Tomlinson* makes clear, the word "act" as used in the statute always refers to the same event: defendant's wrongful act. 244 Kan. at 481, 770 P.2d at 829–30. In *Tomlinson,* the wrongful act occurred, at the latest, when plaintiff was last exposed to asbestos that had been manufactured by defendant, and not when defendant introduced its dangerous product into the stream of commerce. Similarly, in *Ruthrauff,* the wrongful "initial act" was the explosion, and not the act of constructing the house negligently some years earlier. Acceptance of defendant's argument would require the court not only to ignore the language chosen in *Tomlinson,* but also to find that *Tomlinson* implicitly overruled the central premise of *Ruthrauff:* the "initial act" and the fact of injury were simultaneous.[9] To make such a finding, how-

---

**8.** This ambiguity is resolved elsewhere in the opinion, where it is made clear that 1971 was the date of plaintiff's last exposure to asbestos that had been manufactured earlier by defendant. 244 Kan. at 475, 770 P.2d 825.

**9.** *Tomlinson* held that the date of the wrongful act, rather than a substantial injury, determines the time at which the 10–year limitation begins to run. Seizing upon this holding, defendant urges the court to find that *Tomlinson* overruled *Ruthrauff,* which held that "the 10 year limitation is intended to apply only to those cases in

which the fact of injury is not reasonably ascertainable until some time *after substantial injury occurs."* 214 Kan. at 191, 519 P.2d 661 (emphasis added). *See also Kinell v. N.W. Dible Co.,* 240 Kan. 439, 443, 731 P.2d 245 (1987). In *Ruthrauff,* however, the wrongful act and the substantial injury occurred simultaneously, and the court apparently used the phrase "substantial injury" to refer to this common point in time under the facts of that case. Placed in its proper context, *Tomlinson* merely clarifies that if an injury does not manifest itself until some time after the wrongful act, either because its

ever, would require the court to ignore the *express* recognition in *Tomlinson* that "the rule announced in *Ruthrauff* remain[ed] applicable" to the case before it. 244 Kan. at 477, 770 P.2d at 828.

▇▇▇ From these cases the court concludes that the wrongful "act," as the word is used in K.S.A. § 60–513(b), does not refer to the defendant's initial actions in a sequence of events leading to the plaintiff's injury, but rather to the act of plaintiff's exposure to the injury inducing element.

Defendant also suggests that the relevant commencement date on which the wrongful act took place is 1970, at the latest. For purposes of this motion only, defendant rather magnanimously concedes that some of its TCE may have reached plaintiffs' property as early as 1970. Defendant arrives at this date in reliance upon plaintiffs' expert, who has testified that the TCE now present in the area of plaintiffs' community "left Cessna's property sometime prior to 1970." Doc. 87, at 30. Defendant contends, in essence, that a wrongful act occurred as soon as *any* amount of TCE made its physical debut on the plaintiffs' property, even if this amount was negligible and insufficient to create a health risk or other adverse effect.

The Kansas Supreme Court rejected a similar argument in *Olson v. State Highway Comm'n*, 235 Kan. 20, 679 P.2d 167 (1984). The plaintiff in *Olson* brought an action for permanent damages to her real property, allegedly caused by defendants' blasting activities. The injuries included several cracks in the foundation walls of plaintiff's home and the accumulation of silt in her pond. There was evidence that a single crack had appeared in the wall, and that silt had first begun to enter the pond, on dates two years prior to the filing of the complaint. The court held that it was error to calculate the date of accrual as of the date on which *any* injury first occurred:

development or its discovery is delayed, the time of the wrongful act rather than the substantial injury determines the date on which the 10–year limitation begins to run.

**10.** For purposes of the two-year provision, "the limitation period is triggered, not on the date of

Our statutes of limitation were not designed to force injured parties into court at the first sign of injury, regardless of how slight it might be, just because that injury and damages resulting therefrom may be permanent in nature. We have repeatedly held that where the evidence is in dispute as to when the fact of injury first became reasonably ascertainable to plaintiffs, it is an issue for determination by the trier of fact. The same is true in determining when substantial injury first occurred.

*Olson*, 235 Kan. at 27, 679 P.2d at 173–74 (citation omitted). Thus, *Olson* recognizes that an action for permanent damages to real property accrues, at the earliest, when "the act giving rise to the cause of action first causes *substantial* injury,...." *Id.* at 26, 679 P.2d at 172 (emphasis in original).

Because the wrongful act in *Olson* had occurred within 10 years of the filing of suit, the 10–year provision of K.S.A. § 60–513(b) was not in issue.[10] The logical application of its holding, however, fixes the date on which the wrongful act in the present case occurred. *Olson* stands for the proposition that a cause of action does not accrue until a substantial injury exists or is discoverable. In other words, no "act giving rise to the cause of action" exists until there is some act that "first causes substantial injury...." K.S.A. 60–513(b) (first clause). But the argument advanced by defendant imputes a different meaning to the word "act" as it appears in the final clause of the statute. Although not phrased as such, defendant's contention is that there can be an "act giving rise to the cause of action" within the meaning of the 10–year limitation clause, even *before* the existence of "the act giving rise to the cause of action" as the phrase appears in the first clause. *Tomlinson* has decisively

the wrongful act, but when the consequent injury is substantial or reasonably ascertainable." *Olson*, 235 Kan. at 24, 679 P.2d 167. In contrast, the 10–year provision is referenced to the time of the wrongful act. Thus, only the time of the wrongful act is relevant when the 10–year limitation is implicated.

laid to rest such inconsistent interpretations of the statute.

■ The court therefore concludes that in an action for permanent damages to real property caused by harmful substances, the 10–year limitation of K.S.A. § 60–513(b) begins to run only when the plaintiff's property has been exposed to quantities of that substance sufficient to produce a substantial injury, regardless of whether that injury first develops or is discovered after the exposure to the substance. Moreover, because an injury is "substantial" only to the extent that it is sufficient to support the particular cause of action, *Roe v. Diefendorf*, 236 Kan. 218, 222, 689 P.2d 855 (1984), the amount of TCE in plaintiffs' groundwater must have been in amounts that would have supported an action for permanent and not simply temporary damages. *See Williams*, 241 Kan. at 108, 734 P.2d at 1119 (original action for temporary damages became permanent only during pendency of suit); *Gowing*, 219 Kan. at 144, 547 P.2d at 342 (action for permanent damages less appropriate where there is uncertainty as to future use of land, preventing accurate estimate of damages); *Dougan v. Rossville Drainage Dist.*, 2 Kan.App.2d 125, 129, 575 P.2d 1316 (1978); *see also Cleveland v. Wong*, 237 Kan. 410, 414–15, 701 P.2d 1301 (1985) (cause of action for negligent surgery did not accrue with symptoms of initial surgery, but with diagnosis of injury as permanent). In this case, defendant's wrongful "act" within the meaning of the statute came to be completed as increasingly greater amounts of TCE continued to migrate into plaintiffs' groundwater. The wrongful act was choate, however, and the 10–year limitation began to run, only at the time that the amount of TCE on plaintiffs' land was sufficient to inflict a subsequent injury that would be sufficient to support plaintiffs' action for permanent damages.

■ Applying this rule, the court finds that the facts submitted are inadequate to allow a judicial determination of the date on which the wrongful act first occurred, and that an issue of fact is presented for the jury. If the jury were to find that the amount of TCE in plaintiffs' groundwater before June 23, 1977 was insubstantial, in the sense of insufficient to support the causes of action alleged, then plaintiffs' complaint would have been filed within the 10–year period prescribed by K.S.A. § 60–513(b). In the event of such a finding, the only limitation on plaintiffs' action would be the two-year provision of the statute, which permits the filing of actions within two years of the date of the discovery of the injury. Because none of the plaintiffs had knowledge of the contamination of their water supply until July 14, 1985 at the earliest, plaintiffs' complaint, filed on June 23, 1987, would be timely under the statute.

Finally, the court notes that plaintiffs have alleged a cause of action for "wanton conduct," which apparently involves some wrongful acts separate from those supporting the remaining state claims. Unlike the claims of negligence, trespass, nuisance, and strict liability for ultrahazardous substances, the claim for punitive damages is based in part upon defendant's allegedly willful failure to inform plaintiffs of the presence of TCE in their groundwater as of the time that defendant first learned in May 1985 of its presence. As to these latter acts, it might appear that the 10–year limitation is not implicated, and that the claim is timely as a matter of law. The Kansas Supreme Court has made clear, however, that

> [t]he conduct giving rise to the punitive damages claim must be the same conduct for which actual or compensatory damages were allowed. Where two separate causes of action are tried, arising from different factual situations and different theories, recovery of actual damages in one cause of action is insufficient to permit recovery of punitive damages in the second cause of action.

*Traylor v. Wachter*, 227 Kan. 221, 224–25, 607 P.2d 1094, 1098 (1980). Thus, plaintiffs may not rely upon defendant's recent actions as the *basis* for the punitive damages claim. Nonetheless, plaintiffs have alleged certain willfully wrongful conduct in the same conduct that supports the remaining

tort claims, and in any event, defendant does not move for summary judgment on the "wanton conduct" claim. The court expresses no view at this time as to the admissibility of these subsequent actions under Fed.R.Evid. 404(b) as evidence of the nature of defendant's conduct in allowing the release of TCE from its facility.

Although issues of fact exist regarding the timeliness of plaintiffs' state claims under Kansas law, the constitutional validity of the federal statute involved in this case would obviate the need for the jury to make the foray into this factual thicket. For this reason, the court address the constitutional issues presented.

### B. Federal Commencement Date

■ Defendant concedes that plaintiffs' state claims fall within the terms of a preemptive federal commencement date [11] provided by the Superfund Amendments and Reauthorization Act of 1986, Pub.L. No. 99–499, § 309, 100 Stat. 1613, 1695 (1986):

> In the case of any action brought under State law for personal injury, or property damages, which are caused or contributed to by exposure to any hazardous substance, or pollutant or contaminant, released into the environment from a facility, if the applicable limitations period for such action (as specified in the State statute of limitations or under common law) provides a commencement date which is earlier than the federally required commencement date, such period shall commence at the federally required commencement date in lieu of the date specified in such State statute.

42 U.S.C. § 9658(a)(1) [hereinafter "§ 9658"]. The statute further provides:

> [T]he term "federally required commencement date" means the date the plaintiff knew (or reasonably should have known) that the personal injury or property damages referred to in subsection (a)(1) were caused or contributed to by the hazardous substance or pollutant or contaminant concerned.

*Id.* § 9658(b)(4). The statute effectively creates a federally mandated discovery rule for the accrual of state law claims involving releases of hazardous substances that cause or contribute to personal injury or property damage. Because none of the plaintiffs had knowledge of the contamination of their water supply until July 14, 1985 at the earliest, the federal statute directs that this date preempt any earlier commencement date dictated by state law. Thus, despite the arguable untimeliness of plaintiffs' state claims under Kansas law, application of the federal commencement date to the Kansas two-year limitations period [12] would render these state claims, filed on June 23, 1987, timely.

Defendant challenges the constitutionality of § 9658 under the tenth amendment and the commerce clause. The court addresses these arguments in turn.[13]

---

**11.** The court uses the term "federal commencement date" as that term is intended by the statute: the date on which the period of limitation begins to run. This is not to be confused with the commencement date that refers to the time at which an action is deemed to be filed. *See Chappell v. Rouch,* 448 F.2d 446 (10th Cir. 1971) (federal, rather than Kansas procedural statute, determines the date on which a diversity action is deemed filed).

**12.** If any doubt remained from the wording of the statute, the legislative history of § 9658 confirms that the statute is intended only to affect the time at which the state statute of limitation begins to run, and not the number of years it runs. *See* H.Rep. No. 253, 99th Cong., 2d Sess. 105, *reprinted in* 1986 U.S.Code Cong. & Admin. News 2835, 2887.

**13.** Although not raised by the parties, the court notes that § 9658 may have constitutional valid-

ity independent of the commerce clause. As defendant claims, Congress appears to have intended that § 9658(a)(1) apply even to state claims brought in state court. *See* H.R.Rep. No. 253(I), 99th Cong., 2d Sess. 34, 35, 285, *reprinted in part in* 1986 U.S.Code Cong. & Admin.News 2835, 2960; *Ayers v. Township of Jackson,* 106 N.J. 557, 525 A.2d 287, 300 (1987) (dicta); Light, *Federal Preemption, Federal Conscription Under the New Superfund Act,* 38 Mercer L.Rev. 643, 658 (1987). Given that plaintiffs have chosen a federal forum for their claims, however, the question before this court might be limited to whether Congress may legitimately *extend* the commencement period for state claims brought in *federal court,* even if these claims would be untimely under state law.

Notwithstanding defendant's assertion that the state creating the right "has the exclusive right to determine how long the right is enforce-

### 1. *Tenth Amendment*

Defendant first alleges that § 9658 is an unconstitutional infringement on state sovereignty, in violation of the tenth amendment, which provides:

> The powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States, respectively, or to the people.

The court initially notes that the United States raises, but does not brief, the issue of defendant's standing to raise a tenth amendment challenge. Doc. 112, at 17 n. 16. In *Mountain States Legal Foundation v. Costle*, 630 F.2d 754, 765–72 (10th Cir.1980), *cert. denied*, 450 U.S. 1050, 101 S.Ct. 1770, 68 L.Ed.2d 246 (1981), this circuit found standing lacking for several private parties who raised various constitutional and statutory challenges, including a tenth amendment challenge to portions of the Clean Air Act. *But see Atlanta Gas Light Co. v. U.S. Dep't of Energy*, 666 F.2d 1359, 1368 n. 16 (11th Cir.), *cert. denied*, 459 U.S. 836, 103 S.Ct. 81, 74 L.Ed.2d 78 (1982); *Natural Resources Defense Council v. Costle*, 564 F.2d 573, 579 (D.C.Cir. 1977). In light of the current dormant state of tenth amendment jurisprudence, however, the court finds it unnecessary to address the question of defendant's standing and assumes it for purposes of this motion.[14] *See Nance v. Environmental Protection Agency*, 645 F.2d 701, 716 (9th Cir.) (assuming questionable standing to assert tenth amendment claim), *cert. denied*, 454 U.S. 1081, 102 S.Ct. 635, 70 L.Ed.2d 615 (1981); *United States v. Tonry*, 605 F.2d 144, 148 n. 12 (5th Cir.1979) (same).

In *Garcia v. San Antonio Metro. Transit Auth.*, 469 U.S. 528, 105 S.Ct. 1005, 83 L.Ed.2d 1016 (1985), the Court held that the tenth amendment does not serve as an affirmative constitutional restriction on the authority of Congress to legislate under power otherwise conferred by the commerce clause. The Court expressly overruled the short-lived rule of *National League of Cities v. Usery*, 426 U.S. 833, 96 S.Ct. 2465, 49 L.Ed.2d 245 (1976), which had interpreted the tenth amendment to prohibit federal incursions into areas that would impair the states' ability to perform their "traditional governmental functions." *Id.* at 852, 96 S.Ct. at 2474. In the stead of the rule of *Usery*, which *Garcia* found to be "unsound in principle and unworkable in practice," 469 U.S. at 546, 105 S.Ct. at 1015, the Court held that the principal and basic protection of state sovereignty is found in the various forms of state participation in the federal system. *Id.* at 550–

---

able," (Doc. 87, at 41), the traditional classification of statutes of limitation as "procedural" has long enabled the forum to disregard the time limitation imposed by the sovereign that created the right. *See, e.g., Sun Oil Co. v. Wortman*, 486 U.S. 717, 108 S.Ct. 2117, 2121–26, 100 L.Ed.2d 743 (1988) (Constitution does not prohibit a forum state from applying its own longer statute of limitation to claims created by the substantive law of another state); *Goad v. Celotex Corp.*, 831 F.2d 508 (4th Cir.1987), *cert. denied*, 487 U.S. 1218, 108 S.Ct. 2871, 101 L.Ed.2d 906 (1988); *Schreiber v. Allis–Chalmers Corp.*, 611 F.2d 790 (10th Cir.1979) (applying Mississippi statute of limitation to Kansas cause of action); *Fieldman v. Roper Corp.*, 586 F.Supp. 936 (S.D. Miss.1984) (same); *see generally* Note, *Conflicts of Law—Shopping for a Statute of Limitation* 37 Kan.L.Rev. 423 (1989). Thus, insofar as § 9658 might rationally be characterized as "procedural," Congress may have authority under Article III to require application of this federal time limitation for state causes of action filed in federal court. *See Budinich v. Becton Dickinson & Co.*, 486 U.S. 196, 199, 108 S.Ct. 1717, 1720, 100 L.Ed.2d 178 (1988) ("enactments 'rationally

capable of classification' as procedural rules are necessary and proper for carrying into execution the power to establish federal courts vested in Congress by Article III, § 1"); *cf. Guaranty Trust Co. v. York*, 326 U.S. 99, 108–12, 65 S.Ct. 1464, 1469–71, 89 L.Ed. 2079 (1945) (for purposes of applying state "rules of decision" in diversity actions, statutes of limitation are considered substantive under the *Erie* doctrine). The court does not address these questions, however, and determines the constitutionality of § 9658 as the issue has been framed by the parties.

14. The court also assumes that the tenth amendment only implicates enactments regulating states rather than the citizens of those states, and that § 9658 may properly be construed as such legislation. *See Hodel v. Virginia Surface Mining & Reclamation Ass'n*, 452 U.S. 264, 286, 101 S.Ct. 2352, 2365, 69 L.Ed.2d 1 (1981) (no tenth amendment impediment to congressional regulation directed to private persons and businesses, as opposed to states as states); *see also Garcia*, 469 U.S. at 554, 105 S.Ct. at 1019.

56, 105 S.Ct. at 1017–20. That is, state autonomy is ensured, and its contours are defined, through a constitutional scheme that envisions a state role in the national political process, rather than through a substantive judicial review of the challenged federal action. *Id.* at 554, 105 S.Ct. at 1019. This principle was reemphasized and succinctly stated in *South Carolina v. Baker*, 485 U.S. 505, 108 S.Ct. 1355, 99 L.Ed.2d 592 (1988) (plurality opinion):

> *Garcia* holds that the limits are structural, not substantive—*i.e.*, that States must find their protection from congressional regulation through the national political process, not through judicially defined spheres of unregulable state activity.

108 S.Ct. at 1360. *See also International Ass'n of Fire Fighters v. West Adams County Fire Protection Dist.*, 877 F.2d 814, 820–21 (10th Cir.1989). Thus, in the absence of "some extraordinary defects in the national political process" that might deprive the states of their right to participation, *Baker*, 108 S.Ct. at 1360–61, or of some express constitutional guaranty of state integrity in a certain area, *see Garcia*, 469 U.S. at 550, 105 S.Ct. at 1017, "nothing in *Garcia* or the Tenth Amendment authorizes courts to second-guess the substantive basis for congressional legislation." *Baker*, 108 S.Ct. at 1361.

■ Irrespective of defendant's standing to raise this issue, *Garcia* makes clear that the tenth amendment provides this court with no standard by which to determine whether § 9658 deprives states of a "core" or "essential" attribute of state sovereignty. Because defendant has offered nothing to suggest a defect in the political process underlying the enactment of § 9658, the court must reject this challenge.

### · 2. Commerce Clause

■ Defendant also attacks § 9658 under the commerce clause of the Constitution. U.S. Const. art. I, § 8, cl. 3.

The task of a court that is asked to determine whether a particular exercise of congressional power is valid under the Commerce Clause is relatively narrow.

The court must defer to a congressional finding that a regulated activity affects interstate commerce, if there is any rational basis for such a finding. This established, the only remaining question for the judicial inquiry is whether "the means chosen ... [are] reasonably adapted to the end permitted by the Constitution."

*Hodel v. Virginia Surface Mining & Reclamation Ass'n*, 452 U.S. 264, 276, 101 S.Ct. 2352, 2360, 69 L.Ed.2d 1 (1981) (citations omitted). In determining whether the regulated activity affects interstate commerce, "[t]he pertinent inquiry ... is not how much commerce is involved but whether Congress could rationally conclude that the regulated activity affects interstate commerce." *Hodel v. Indiana*, 452 U.S. 314, 324, 101 S.Ct. 2376, 2383, 69 L.Ed.2d 40 (1981).

In *Pennsylvania v. Union Gas Co.*, 491 U.S. 1, 109 S.Ct. 2273, 105 L.Ed.2d 1 (1989), the Court held that Congress legitimately abrogated the eleventh amendment immunity of the states when it exercised its commerce clause power to authorize private CERCLA actions against states. *Id.* 109 S.Ct. at 2281–85 & 2295 (White, J., concurring in plurality's conclusion). The CERCLA action in *Union Gas* involved an attempt by a private party to recover cleanup costs from the Commonwealth of Pennsylvania as "owner and operator" of a hazardous waste site. Although *Union Gas* was primarily concerned with the broader issue of Congress' general commerce clause power to enact legislation that subjects states to liability, it also addressed the exercise of this power within the specific context of the CERCLA statute. It was noted that "[t]he general problem of environmental harm is often not susceptible of local solution," *id.* at 2284, and that Congress had previously, and unsuccessfully, attempted "to solve the problem posed by hazardous substances through other means." *Id.* at 2285. Writing for the plurality, Justice Brennan concluded: "This case thus shows why the space carved out for federal legislation under the commerce power must include the power to hold States financially accountable not only to

the Federal Government, but to private citizens as well." *Id.*

Necessarily implicit in the decision in *Union Gas* is that the commerce clause authorizes Congress to extend federal jurisdiction to claims involving the injurious effects of hazardous substances. *See also Wickland Oil Terminals v. Asarco, Inc.,* 654 F.Supp. 955, 957 (N.D.Cal.1987) (commerce clause authorizes enactment of CERCLA). Notwithstanding *Union Gas,* defendant contends that § 9658 satisfies neither prong of the commerce clause test. Doc. 113, at 8. As to the first requirement, defendant suggests somewhat obliquely that § 9658 could survive constitutional scrutiny only if Congress had made specific findings regarding the interstate commerce effect of state limitations periods that do not maintain a discovery rule. Doc. 113, at 7–8. To the extent that defendant seeks to require that § 9658 directly relate to interstate commerce, this argument must fail.

> A complex regulatory program ... can survive a Commerce Clause challenge without a showing that every single facet of the program is independently and directly related to a valid congressional goal. It is enough that the challenged provisions are an integral part of the regulatory program and that the regulatory scheme when considered as a whole satisfies this test.

*Hodel v. Indiana,* 452 U.S. at 329 n. 17, 101 S.Ct. at 2386 n. 17. *See also United States v. Lane,* 883 F.2d 1484, 1492 (10th Cir.1989)("Congress is not required to make 'particularized findings in order to legislate'" under the commerce clause), *cert. denied,* —— U.S. ——, 110 S.Ct. 872, —— L.Ed.2d —— (1990). Similarly, it is irrelevant that the specific activity forming the basis of a particular action may not have any effect on interstate commerce. The Supreme Court has made clear that

> the commerce power extends not only to "the use of channels of interstate or foreign commerce" and to "protection of the instrumentalities of interstate commerce ... or persons or things in commerce," but also to "activities affecting commerce." ... "[[E]]ven activity that is purely intrastate in character may be regulated by Congress, where the activity, combined with like conduct by others similarly situated, affects commerce among the States or with foreign nations."

*Virginia Surface Mining,* 452 U.S. at 276–77, 101 S.Ct. at 2360 (citations omitted). *See also Garcia,* 469 U.S. at 537, 105 S.Ct. at 1010; *Utah v. Marsh,* 740 F.2d 799, 803 (10th Cir.1984). Thus, the first element of a commerce clause inquiry is satisfied if Congress could rationally conclude that the regulated activity, taken as a whole, impacts upon interstate commerce, and if the challenged provision is part of a comprehensive scheme regulating this activity.

The legislative history of CERCLA is replete with congressional findings regarding the pervasive effects of hazardous substances released into the environment.[15] *See* S.Rep. No. 848, 96th Cong., 2d Sess. 5–6 (1980)(citing testimony estimating that about 50% of hazardous substance spills reach navigable waters); H.Rep. No. 1016, 96th Cong., 2d Sess. 17–20, *reprinted in* 1980 U.S.Code Cong. & Admin.News 6119, 6119–23. And as reaffirmed in *Union Gas,* the commerce clause empowers Congress to regulate activity involving the release of hazardous substances precisely because the harm caused by these substances often does not lend itself to local solution. 109 S.Ct. at 2284. *See also Virginia Surface Mining,* 452 U.S. at 282, 101 S.Ct. at 2363 ("the Commerce Clause [is] broad enough to permit congressional regulation of activities causing air or water pollution, or other environmental hazards that may have effects in more than one State"). Congress retains ample authority under the commerce clause to enact legislation regulating

---

**15.** Even in the absence of such findings, it is well established that the commerce power of Congress extends to the regulation of conditions under which goods shipped in interstate commerce are produced. *See, e.g., Virginia Surface Mining,* 452 U.S. at 281, 101 S.Ct. at 2362. Defendant has made no suggestion that the aircraft resulting from its business activity, and that of other similarly situated companies, do not move in interstate commerce. Nor has defendant disputed that TCE was used in the production of these aircraft.

activities that result in the release of hazardous substances such as TCE.

■ Nor does the court have any doubt that § 9658 is an integral part of the regulatory scheme of CERCLA. *See Wickland Oil Terminals v. Asarco, Inc.*, 792 F.2d 887, 890 (9th Cir.1986)(discussing several features of CERCLA). This section was enacted in response to the report of a study group that had been commissioned by Congress under CERCLA "to determine the adequacy of existing common law and statutory remedies" for harm "caused by the release of hazardous substances into the environment...." Pub.L. No. 96–510, § 301, 94 Stat. 2767, 2807 (1980)(codified at 42 U.S.C. § 9651(e)). The study group found that the limitation statutes of some states operated to bar claims even before plaintiffs could discover their injury, and that such statutes were ill-suited to the frequently latent injuries caused by hazardous substances. *See* 4 Grad, *Treatise on Environmental Law* SLR–51, –52 (1988); *Knox v. AC & S, Inc.*, 690 F.Supp. 752, 757 (S.D.Ind.1988); *see also* S.Rep. No. 848, 96th Cong., 2d Sess. 13 (1980)("the legal mechanisms in the States studied are generally inadequate for redressing toxic substances-related harms, and traditional tort law presents substantial barriers to recovery"). The drafters of § 9658 acknowledged these findings and expressed concern that certain state statutes of limitation operated to "deprive plaintiffs of their day in court." H.Conf.Rep. No. 962, 99th Cong., 2d Sess. 261, *reprinted in* 1986 U.S. Code Cong. & Admin.News 3276, 3354; H.Rep. No. 253(I), 99th Cong., 2d Sess. 105, *reprinted in* 1986 U.S.Code Cong. & Admin.News 2835, 2887. Clearly, § 9658 is part of a comprehensive regulatory scheme that envisions the continued viability of existing state remedies for environmental injuries, while ensuring that the injured parties do not forfeit these claims to restrictive state limitation statutes.

The only remaining question is whether § 9658 is a rational means of regulating the release of hazardous substances. Defendant does not appear to question the reasonableness of addressing these problems through a measure that provides private parties with a federal cause of action under CERCLA, nor could such an argument survive *Union Gas. See* 109 S.Ct. at 2285; *see also United States v. Northeastern Pharmaceutical & Chem. Co.*, 810 F.2d 726, 734 (8th Cir.1986), *cert. denied*, 484 U.S. 848, 108 S.Ct. 146, 98 L.Ed.2d 102 (1987); *Parsell v. Shell Oil Co.*, 421 F.Supp. 1275, 1281 n. 15 (D.Conn. 1976)("Congress can regulate pollution affecting interstate commerce as expansively as the modern reach of the commerce clause permits, and this power can be used to authorize private enforcement if Congress so chooses."), *aff'd mem.*, 573 F.2d 1289 (2d Cir.1977); S.Rep. No. 848, 96th Cong., 2d Sess. 13 (1980) (discussing importance of strict liability within the goals of CERCLA); H.Rep. No. 253, 99th Cong.2d Sess. 54–61, *reprinted in* 1986 U.S.Code Cong. & Admin.News 2835, 2836–43. Moreover, defendant concedes that "Congress may even have the right, if interstate commerce is affected, to create federal causes of action akin to the nuisance and trespass claims asserted by plaintiffs,...." Doc. 105, at 9. Yet defendant apparently assails the reasonableness of a framework that retains existing state remedies, but imposes upon these state causes of action a uniform federal commencement date.

The court is at a loss to find anything unreasonable in such a scheme. It is not for the courts to sit as a superlegislature that dictates to Congress the means by which it must accomplish its legitimate purposes. *Hodel v. Indiana*, 452 U.S. at 333, 101 S.Ct. at 2388. By leaving intact state remedies, Congress has allowed the victims of environmental harm to maintain common law causes of action as an additional tool against the effects of hazardous substances.[16] Presumably under defendant's

---

**16.** The CERCLA statute was not intended to provide remedies for every type of injury resulting from the release of hazardous substances. *See* 42 U.S.C. § 9604(a)(3) (limiting President's authority to provide for certain removal or remedial actions); *Ambrogi v. Gould, Inc.*, 750 F.Supp. 1233, 1248 (M.D.Pa.1990) (CERCLA does not authorize recovery of "economic loss");

conception, Congress may create redundant federal causes of action with their own federal accrual date, but it may not apply this federal commencement date to those existing state remedies that it has chosen to retain. The court perceives no distinguishing principle that would render the former solution rational and the latter irrational.[17] Although Congress is vested with plenary authority over matters affecting interstate commerce, there is no requirement that a given exercise of this authority completely preempt every aspect of state law. *Virginia Surface Mining*, 452 U.S. at 290–91, 101 S.Ct. at 2367–68. That Congress has chosen to allow the states a continued role in redressing injuries caused by hazardous substances does not deprive it of the power to preempt selectively those aspects of state law found wanting.

The court concludes that § 9658 represents a valid exercise of the commerce power of Congress. Finding no constitutional infirmity in the statute, federal law dictates that the court find plaintiffs' state claims to be timely under the two-year limitation period of K.S.A. § 60–513. Accordingly, it shall be unnecessary for plaintiffs to establish at trial the timeliness of their claims under Kansas law.

### III. *Subject Matter Jurisdiction Over Claims of Adult Children*

Defendant alleges that the adult children of the plaintiff homeowners ("plaintiff children") have no federal cause of action, and that the court therefore lacks subject matter jurisdiction over their state law claims. The court considers these arguments separately.

### A. Existence of Federal Claim

The plaintiff children contend that they have incurred certain costs recoverable under CERCLA that are sufficient to state a federal claim. Specifically, these plaintiffs claim costs in the form of expenses incurred "prior to and during litigation" for: 1) groundwater monitoring, 2) groundwater modeling and investigation, and 3) a health assessment by a toxicologist relating to plaintiffs' exposure to TCE. Both the homeowners and the plaintiff children claim a pro rata share for these expenses, which total $13,781.02.[18]

Section 107(a)(4) of CERCLA subjects persons responsible[19] for the release of hazardous substances to liability for:

(A) all costs of removal or remedial action incurred by the United States Government [and] . . .

(B) any other necessary *costs of response* incurred by any other person *consistent with the national contingency plan* . . . .

42 U.S.C. § 9607(a)(4) (emphases added). Defendant argues that the costs claimed by the plaintiff children are not recoverable

---

*Piccolini v. Simon's Wrecking,* 686 F.Supp. 1063, 1068 (M.D.Pa.1988) (lost income and property value excluded); *see also First United Methodist Church v. United States Gypsum Co.,* 882 F.2d 862, 866–69 (4th Cir.1989) (asbestos removal not within scope of CERCLA response actions or federal commencement date of § 9658), *cert. denied,* —— U.S. ——, 110 S.Ct. 1113, 107 L.Ed.2d 1020 (1990).

**17.** Contrary to defendant's intimation, federal "interference" with state statutes of limitation is not unprecedented. For example, the Soldiers' and Sailors' Civil Relief Act of 1940 tolls the period of limitation for any civil action or proceeding, in any court, by or against any person in military service. 50 U.S.C.App. § 525. Also, federal civil rights actions are governed by state statutes of limitation, yet courts determine the time at which the statute begins to run by reference to federal rather than state law. *Ebrahimi v. E.F. Hutton & Co.,* 852 F.2d 516, 520 (10th Cir.1988); *Newcomb v. Ingle,* 827 F.2d 675, 678 (10th Cir.1987) (en banc).

**18.** Dividing this amount by the 42 named parties yields a total of $328.12 claimed by each of the eight children. Defendant does not challenge the real party in interest status of the plaintiff children to assert these claims. *See* Fed.R.Civ.P. 17(a); *F.D.I.C. v. Bachman,* 894 F.2d 1233, 1236 (10th Cir.1990). Nor does defendant attempt to argue that the claims of the plaintiff children, even if recoverable as response costs, are too insubstantial to warrant the exercise of pendent jurisdiction over their state claims. *See infra* at 713–716. Defendant argues only that the plaintiff children have no federal claim.

**19.** Those who are potentially liable in § 107 actions include "owners and operators," 42 U.S.C. §§ 9607(a)(1) & 9601(20)(A), and other "persons." *Id.* §§ 9607(a)(2)–(4) & 9601(21).

either because they are not "response costs" or because they are not consistent with the national contingency plan. This contention requires a review of the nature of the expenses claimed and of the statutory and regulatory provisions authorizing their recovery.

### 1. *Litigation Expenses*

■ Defendant first argues that CERCLA does not authorize recovery of the plaintiff children's claimed damages because these damages are litigation expenses and, as such, are not "response costs" under § 9607(a)(4)(B). The courts are divided as to whether the response costs recoverable under § 9607(a)(4)(B) include a private party's litigation expenses. The only circuit court to have addressed this issue recently concluded that attorney fees and expenses are recoverable in such private actions, finding that "it would strain the statutory language to the breaking point to read them out of the 'necessary costs' that section 9607(a)(4)(B) allows private parties to recover." *General Elec. Co. v. Litton Indus. Automation Sys., Inc.*, 920 F.2d 1415, 1422 (8th Cir.1990). *See also Lykins v. Westinghouse Elec.*, 18 Envtl.L.Rep. (Envtl.L.Inst.) 21,498 (E.D.Ky. 1988)(1988 WL 114522, at 4) (dicta); *but see United States v. Hardage*, 750 F.Supp. 1460, 1511 (W.D.Okl.1990); *T & E Indus., Inc. v. Safety Light Corp.*, 680 F.Supp. 696, 707–08 (D.N.J.1988).

The court finds the view expressed by the Eighth Circuit in *General Electric* to be the more reasonable interpretation of the statute. It is true that Congress did not specifically address the issue of attorney's fees and other litigation expenses in defining "response costs." But there are a myriad of issues that are not expressly resolved by the statute, which has been criticized for failing to provide a satisfactory definition of response costs. *See Artesian Water Co. v. Government of New Castle County*, 851 F.2d 643, 648 (3d Cir.1988), *aff'g*, 659 F.Supp. 1269 (D.Del. 1987); *Ambrogi v. Gould, Inc.*, 750 F.Supp.

1233, 1240 (M.D.Pa.1990); *Lutz v. Chromatex, Inc.*, 718 F.Supp. 413, 416 (M.D.Pa. 1989). By providing private parties with a federal cause of action for the recovery of necessary expenses in the cleanup of hazardous wastes, Congress intended § 107 as a powerful incentive for these parties to expend their own funds initially without waiting for the responsible persons to take action. *See Union Gas*, 109 S.Ct. at 2285; *Artesian Water*, 659 F.Supp. at 1288; *City of New York v. Exxon Corp.*, 633 F.Supp. 609, 616–17 (S.D.N.Y.1986); *Pinole Point Properties, Inc. v. Bethlehem Steel Corp.*, 596 F.Supp. 283, 288 (N.D.Cal.1984); *State ex rel. Brown v. Georgeoff*, 562 F.Supp. 1300, 1311–14 (N.D.Ohio 1983). The court can conceive of no surer method to defeat this purpose than to require private parties to shoulder the financial burden of the very litigation that is necessary to recover these costs. Thus, to the extent that any litigation costs incurred by plaintiffs fall within the meaning of the "necessary costs" authorized under § 9607(a)(4)(B), plaintiffs are entitled to recover such costs.

■ Although CERCLA authorizes plaintiffs to recover litigation costs, this is not to say that such costs alone may provide the jurisdictional basis for plaintiffs' untried state claims in federal court. It would create a jurisdictional novelty if the court were to allow a plaintiff possessing only state claims to bootstrap these claims into federal court simply with the litigation costs incurred in preparation for filing the claims in federal court. If the costs incurred by plaintiffs are deemed "litigation expenses," these expenses must have been taken in pursuit of recovering response costs independent of the litigation expenses. Unlike the homeowners, the plaintiff children have alleged no response costs other than those for the monitoring of the groundwater and for the assessment of the health risk posed by the contaminated water. The court therefore considers whether the costs alleged by the plaintiff children independently fall within the statutory definition of response costs.

## 2. Groundwater Monitoring[20]

Plaintiffs characterize their groundwater monitoring and investigatory expenses only as "response costs" without further specification. Response costs under CERCLA, however, fall into two broad categories. The statute defines the term "response" to mean "removal, remedy, and remedial action." 42 U.S.C. § 9601(25). "Removal actions" may include

such actions as may be necessary to monitor, assess, and evaluate the release or threat of release of hazardous substances, ... or the taking of such actions as may be necessary to prevent, minimize, or mitigate damage to the public health or welfare or to the environment....

*Id.* § 9601(23). In contrast,

[t]he terms "remedy" or "remedial action" means [mean] those actions consistent with permanent remedy taken instead of or in addition to removal actions ... to prevent or minimize the release of hazardous substances so that they do not migrate to cause substantial danger to present or future public health or welfare or the environment.

*Id.* § 9601(24). "Removal" costs are those that are incurred in response to an immediate threat to the public health or environment and that are intended primarily for the short-term abatement of toxic waste hazards. *Amland Properties Corp. v. Aluminum Co. of Am.,* 711 F.Supp. 784, 795 (D.N.J.1989)(quoting *Piccolini v. Simon's Wrecking,* 686 F.Supp. 1063, 1068 (M.D.Pa.1988)). Remedial actions, however, are generally considered to be long-term or permanent. *Id.* (quoting *T & E Indus., Inc. v. Safety Light Corp.,* 680 F.Supp. 696, 706 (D.N.J.1988)). *See also Ambrogi v. Gould, Inc.,* 750 F.Supp. 1233, 1240 (M.D.Pa.1990).

As to activities involving the investigation or testing of groundwater for the presence of hazardous substances, the courts appear to be in agreement that such activity constitutes "removal" action. *Wickland Oil Terminals v. Asarco, Inc.,* 792 F.2d 887, 892 (9th Cir.1986); *Amland,* 711 F.Supp. at 795. The court therefore concludes that under these facts plaintiffs' groundwater testing was a removal action within the meaning of 42 U.S.C. § 9601(23).[21] As such, these costs are potentially recoverable under CERCLA. *Brewer v. Ravan,* 680 F.Supp. 1176, 1179 (M.D.Tenn.1988). The court additionally notes that these testing costs are recoverable even though taken as additional measures, independent of those already taken by the KDHE. *See Artesian Water,* 851 F.2d at 651 (private party need not rely solely on state's preliminary testing of ground water).

Nonetheless, defendant contends that plaintiffs' costs for groundwater testing, even if cognizable response costs, are not recoverable in this action because they are not "consistent with the national contingency plan" ("NCP"), as required under § 9607(a)(4)(B). *See City of Philadelphia v. Stepan Chem. Co.,* 544 F.Supp. 1135, 1144 n. 16 (E.D.Pa.1982)(consistency with NCP relates to recoverability and not existence of valid claim). In a private CERCLA enforcement action, plaintiffs must establish that they incurred response costs consistent with the NCP. *United States v. Northeastern Pharmaceutical & Chem. Co.,* 810 F.2d 726, 749 (8th Cir.1986), *cert. denied,* 484 U.S. 848, 108 S.Ct. 146, 98 L.Ed.2d 102 (1987); *Ambrogi,* 750 F.Supp. at 1239 (setting forth elements of prima facia case for recovery of response costs); *Commerce Holding Co. v. Buckstone,* 749 F.Supp. 441, 444 (E.D.N.Y.1990); *Amland,* 711 F.Supp. at 794. Pursuant to 42 U.S.C. § 9605, and as periodically authorized by executive order, the Environmental Protection Agency ("EPA") promulgates the

---

**20.** In this section the court refers to those costs associated with plaintiffs' groundwater monitoring as well as groundwater modeling and investigation.

**21.** This finding obviates the need to consider whether strict compliance with the detailed requirements of the national contingency plan is required in order to recover the costs of a "remedial action." *See Amland,* 711 F.Supp. at 793–801 (concluding that strict compliance is required); *but see* 40 C.F.R. § 300.700(c)(3)(i) (1990) (requiring only substantial compliance).

NCP. With respect to private enforcement actions under § 9607(a)(4)(B), the version of the NCP in effect at the time plaintiffs conducted the groundwater testing provided:

> For purposes of cost recovery under section 107 of CERCLA ... a response action will be consistent with the NCP ... if the person taking the response action:
>
> (i) Where the action is a removal action, acts in circumstances warranting removal and implements removal action consistent with § 300.65.

40 C.F.R. § 300.71 (1989). In turn, the 1985 version of 40 C.F.R. § 300.65(a)(2) [22] states in relevant part:

> Where the responsible parties are known, an effort initially shall be made, to the extent practicable considering the exigencies of the circumstances, to have them perform the necessary removal actions. Where responsible parties are unknown, an effort initially shall be made, to the extent practicable considering the exigencies of the circumstances, to locate them and have them perform the necessary removal action.

Defendant argues that plaintiffs made no effort to have Cessna perform the testing of their groundwater, and that by virtue of this failure, plaintiffs' response costs for this action are not consistent with the NCP.

The court initially notes that the EPA extensively revised the NCP in 1990. *See* 55 Fed.Reg. 8,666–8,865 (1990). The EPA has also expressed its intention that the 1990 NCP apply retroactively to private response actions that are "underway," although its view regarding *completed* response actions is somewhat vague. *See* 55 Fed.Reg. 8,795 (1990). *See also Artesian Water,* 659 F.Supp. at 1293–94. In any event, the court finds that both versions of the NCP obtain the same result in this case, and that it is unnecessary to address the issue of retroapplicability.

For purposes of § 107 cost recovery actions, the EPA now requires only "substan-

tial compliance" with certain requirements of the NCP, while exempting other "requirements" completely. 40 C.F.R. § 300.700(c)(3)(i) (1990). *See also* 55 Fed. Reg. 8,792–95 (1990). Among the provisions of the NCP that are "potentially applicable" to response actions by a private party is "[s]ection 300.415 (on removal actions) *except paragraph[ ] (a)(2), ....*" 40 C.F.R. § 300.700(c)(5)(vi) (1990)(emphasis added). This excepted paragraph of the section addressing removal actions provides:

> Where the responsible parties are known, an effort initially shall be made, to the extent practicable, to determine whether they can and will perform the necessary removal action promptly and properly.

40 C.F.R. § 300.415(a)(2) (1990). Thus, the provision of the NCP that currently defines what actions are deemed to be "consistent with the NCP" expressly exempts the paragraph that directs private parties to attempt to enlist the efforts of "responsible parties." [23]

Such an exemption is not surprising, insofar as it is merely a continuation of the EPA's policy under the 1985 NCP. *See* 55 Fed.Reg. 8,795 (1990)(concluding that compliance with 1985 NCP would also comply with 1990 NCP). Upon issuing the 1985 NCP, the EPA explained that two amendments to the plan would exempt § 106 and § 107 actions from the requirement of attempting to have the responsible parties perform the removal action:

> [R]emovals pursuant to section 106 of CERCLA *and other non-Fund-financed response actions* are not subject to the following requirements:
>
> . . . .
>
> 3. Requirement to locate responsible parties and encourage responsible parties to undertake the response action.

To be consistent with the NCP for purposes of cost recovery under section 107

---

**22.** *Cf.* revised version at 40 C.F.R. § 300.415(a)(2) (1990).

**23.** *See also* 40 C.F.R. §§ 300.700(c)(3)(i), 300.-700(c)(5)(v), & 300.410(e)(6) (1990) (no require-

ment in § 107 actions that private party terminate its "removal site evaluation" when determined that responsible party is providing appropriate response).

of CERCLA, all *other* requirements and criteria outlined in § 300.65 shall be met, where appropriate. *Although EPA has not required that private parties try and locate responsible parties and encourage them to undertake the response, EPA believes that such action will be helpful if the private party contemplates attempting to recover response costs from the responsible parties.*

50 Fed.Reg. 47,935 (1985)(emphases added).

The EPA has consistently interpreted the "requirement" urged by defendant to be nothing more than a suggestion. "An agency's interpretation of its regulations is ' "of controlling weight unless it is plainly erroneous or inconsistent with the regulation[s]." ' " *Wickland*, 792 F.2d at 892 (quoting *Udall v. Tallman*, 380 U.S. 1, 16–17, 85 S.Ct. 792, 801, 13 L.Ed.2d 616 (1965)). Because plaintiffs were not required to encourage defendant to conduct the groundwater testing, the failure to do so does not defeat the recoverability of this response cost, if otherwise consistent with the NCP. Defendant has presented no other challenge to these costs, and the court therefore concludes that the plaintiff children have stated a cognizable claim under CERCLA. *See Tanglewood East Homeowners v. Charles–Thomas, Inc.*, 849 F.2d 1568, 1575 (5th Cir.1988)(consistency with NCP cannot be resolved without development of relevant evidence).

### 3. *Health Assessments*

The plaintiff children also claim a pro rata share of the expenses associated with a toxicologist's assessment of the health risks arising from the community's exposure to TCE. The courts have divided on the issue of the recoverability under CERC-LA of medical monitoring or testing costs. *See Ambrogi v. Gould, Inc.*, 750 F.Supp. 1233, 1244–45 (M.D.Pa.1990)(citing cases); *Werlein v. United States*, 746 F.Supp. 887, 901–02 (D.Minn.1990) (same). In support of their position, plaintiffs rely on *Brewer v. Ravan*, 680 F.Supp. 1176 (M.D.Tenn. 1988), the leading case for the proposition that public-health-related medical testing expenses, as opposed to the costs of medical treatment, are recoverable response costs. With little analysis, *Brewer* stated that such "tests and screening clearly are necessary to 'monitor, assess, [or] evaluate a release' and, therefore, constitute 'removal' under section 9601(23)." 680 F.Supp. at 1179.

The conclusion of the court in *Brewer* was rejected in an extensive analysis in *Ambrogi v. Gould, Inc.*, 750 F.Supp. 1233, 1246–50 (M.D.Pa.1990). The *Ambrogi* court based it decision on several grounds. First, the court found that medical testing expenses are not within the scope of the language of § 9601(23), which generally confines the definition of removal actions to "such actions" as are necessary for the cleanup of hazardous substances—if not through the actual removal, then through responses that remove the threat posed to public health.[24] *Ambrogi* also determined that recovery of medical costs would not "facilitate prompt, thorough, and cost-effective cleanup of a hazardous waste site," contrary to the broader purposes of the statute. *Id.* at 1248. Finally, the court noted that Congress has expressly provided for medical examinations, testing, and monitoring at certain hazardous waste sites through the Agency for Toxic Substances and Disease Registry. *Id.* at 1249.[25]

---

**24.** In fact, all the examples stated in the statutory definition refer to actions that prevent or limit human contact with the hazardous substance. *See* § 9601(23) ("security fencing or other measures to limit access, provision of alternative water supplies, temporary evacuation and housing of threatened individuals....")

**25.** Other cases in accord with *Ambrogi* have found support in Congress' rejection of language in the Senate Bill that would have allowed recovery of medical testing expenses. *See Coburn*

*v. Sun Chem. Corp.*, 19 Envtl.L.Rep. (Envtl.L. Inst.) 20,256 (E.D.Pa.1988) (1988 WL 120739, at 4–5) (citing S.Rep. No. 848, 96th Cong., 2d Sess. 54 (1980); 126 Cong.Rec. 14,964 (daily ed. Nov. 24, 1980) (comments of Senator Randolph deleting cause of action for medical expenses or property loss)). The *Ambrogi* court dismissed such reliance, finding the legislative history of CERCLA to be of limited usefulness. 750 F.Supp. at 1246 n. 16.

■ The court finds the decision in *Ambrogi* and the cases it followed to reflect a more accurate reading of the statute. *See also Werlein v. United States*, 746 F.Supp. 887, 903–04 (D.Minn.1990) (concluding that medical testing expenses are not recoverable); *Keister v. Chem. Corp.*, 59 U.S.L.W. 2371, 1990 WL 261861 (E.D.Ark. Nov. 11, 1990) (same). The court would be able to bring medical testing and health assessment costs within the meaning of "removal actions" only by reading the statutory language of § 9601(23) in isolation, without regard for the remainder of this subsection and the CERCLA statute as whole. Thus, plaintiffs may not rely on these claimed costs as a basis for federal jurisdiction under CERCLA.

## B. Pendent Jurisdiction over State Claims

The court has concluded that the plaintiff children have stated a federal claim under CERCLA for the recovery costs in ground water testing. The documentation submitted by plaintiffs reveals a total cost for these services in the amount of $8,807.98. Thus, each of the 42 plaintiffs, who claim a pro rata share of these expenses, has incurred response costs in the amount of $209.71.[26] As noted, *supra* note 18, defendant does not challenge the court's jurisdiction over these plaintiffs' state claims on the ground that their federal claims are insubstantial, but only that they are entirely absent. *See United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 726, 86 S.Ct. 1130, 1139, 16 L.Ed.2d 218 (1966) (state claims should be dismissed "if it appears that the state issues substantially predominate, whether in terms of proof, . . . or of the comprehensiveness of the remedy sought. . . ."); *Thatcher Enters. v. Cache County Corp.*, 902 F.2d 1472, 1478 (10th Cir.1990). Nonetheless, as a jurisdictional matter, the court has an independent obligation to satisfy itself of the basis for hearing the state claims of the plaintiff

children. *See Commerce Holding Co. v. Buckstone*, 749 F.Supp. 441, 446–47 (E.D. N.Y.1990) (dismissing state law claims that predominated over CERCLA claim); *GRM Industries, Inc. v. Wickes Mfg. Co.*, 749 F.Supp. 810, 815 (W.D.Mich.1990) (same); *Polger v. Republic Nat'l Bank*, 709 F.Supp. 204, 210 (D.Colo.1989) (same).

■ The court finds it unnecessary, however, to address whether the federal claims of the plaintiff children are jurisdictionally insubstantial in relation to their state claims. Even assuming that plaintiffs' federal claims do not warrant the exercise of "pendent claim jurisdiction," the related doctrine of "pendent party jurisdiction" remains a potentially viable ground for hearing the claims of persons who have no federal cause of action, yet who seek to join their state claims with the federal claims possessed by other parties.

■ The availability of pendent party jurisdiction depends in large part upon the factors set forth by the Supreme Court in *Finley v. United States*, 490 U.S. 545, 109 S.Ct. 2003, 104 L.Ed.2d 593 (1989). The court must satisfy itself of the existence of a constitutional relationship between the federal and nonfederal claims, such that the entire action may be said to comprise "but one constitutional 'case.'"[27] *Id.* 109 S.Ct. at 2006 (quoting *Gibbs*, 383 U.S. at 725, 86 S.Ct. at 1138). This constitutional aspect directs that the court conduct the familiar inquiry of whether "the federal and nonfederal claims 'derive from a common nucleus of operative fact' and are such that a plaintiff 'would ordinarily be expected to try them in one judicial proceeding.'" *Id.* The second, and often dispositive, factor requires the court to focus on the specific language of the statute granting jurisdiction to the district court. Unlike pendent claim jurisdiction, the authority of federal courts to hear the claims of parties who themselves have no federal claim depends upon an affirmative action

---

**26.** Collectively, the eight plaintiff children claim $1,677.68.

**27.** More precisely, the *Finley* Court assumed, without deciding, that the constitutional criterion established by *Gibbs* for pendent claim juris-

diction also applies to pendent party jurisdiction. 109 S.Ct. at 2006–07. *See also Owen Equip. & Erection Co. v. Kroger*, 437 U.S. 365, 371 n. 10, 98 S.Ct. 2396, 2401 n. 10, 57 L.Ed.2d 274 (1978).

of Congress, and is not presumed from a general statutory grant.[28] *Id.* 109 S.Ct. at 2007. Finally, even if the state claims are found to have a constitutional and statutory basis for a common federal adjudication, the court must decide whether discretionary factors warrant the exercise of jurisdiction in the particular case before it. *Gibbs,* 383 U.S. at 726–27, 86 S.Ct. at 1139.

Before addressing the constitutional considerations, the court determines whether the jurisdictional statute for private CERCLA actions vests federal courts with power to hear the state law claims of parties who have no federal claim.

The section of the CERCLA statute creating federal court jurisdiction over this matter states:

> Except as provided in subsections (a) and (h) of this section, the United States district courts shall have exclusive original jurisdiction over all controversies arising under this Act, without regard to the citizenship of the parties or the amount in controversy.

42 U.S.C. § 9613(b). It should first be noted that the only express language in this statute addressing the issue of parties is language that negates any inference of exclusion: jurisdiction under CERCLA is to be exercised "without regard to the citizenship of the parties." Additionally, the statute grants exclusive jurisdiction to the district courts—a factor tending to support the existence of pendent party jurisdiction. *See Aldinger v. Howard,* 427 U.S. 1, 18, 96 S.Ct. 2413, 2422, 49 L.Ed.2d 276 (1976). More important, however, is the language

chosen to define the types of claims within the statute's jurisdictional scope: the federal courts have exclusive original jurisdiction *"over all controversies arising under this Act,...."* Significantly, Congress did not limit the grant to "all claims" or "all civil actions on claims"[29] arising under CERCLA, which might indicate that jurisdiction extends only to those claims created by CERCLA. Instead, the statute authorizes jurisdiction over "all controversies" arising under CERCLA. Just as the Court in *Gibbs* included certain state claims within the constitutional grant of judicial power to "all cases" arising under the Constitution, so might the language "all controversies" of § 9613(b) permit the conclusion that Congress intended this statute to authorize federal jurisdiction over all claims comprising the entire "controversy"—without regard to the party who is asserting the claim or whether this party has only state claims. This statute thus distinguishes itself in two important respects from the jurisdictional language at issue in *Finley,* where the Court interpreted the language "civil actions on claims against the United States" in the Federal Tort Claims Act to authorize jurisdiction only over claims against the federal government. First, jurisdiction under § 9613(b) is defined without reference to the parties, and refers to "parties" only to remove the possible obstacle of diversity. And second, the statute grants judicial power over all controversies arising under CERCLA that might be said to constitute one "case."

The court finds further evidence of a congressional grant of pendent party juris-

---

**28.** The requirement of an affirmative grant of pendent party jurisdiction is not stated unambiguously in *Finley.* At least Justice Blackmun understood the Court's opinion to have created this requirement, and he observed in his dissent that this represented a departure from the Court's earlier pronouncements, which had only required evidence of a congressional intent to *exclude* the possibility of pendent party jurisdiction. *See* 109 S.Ct. at 2010–11 (Blackmun, J., dissenting); *but see United States v. A & N Cleaners & Launderers, Inc.,* 747 F.Supp. 1014, 1018 n. 4 (S.D.N.Y.1990) (concluding that *Finley* does not require an affirmative grant). For purposes of this motion, the court assumes that *Finley* did effect the change expressed by Justice Blackmun.

**29.** The *Finley* Court rejected the argument that there is any substantive distinction to be drawn between the language "claim against the United States" and "civil actions on claims against the United States." Although the latter formulation might suggest an intent to confer jurisdiction over an entire "civil action" that includes federal claims, the Court explained that the difference between the two was merely a stylistic change prompted by the terminology adopted by the Federal Rules of Civil Procedure. 109 S.Ct. at 2009–10. No such ground exists as a basis for dismissing the reference to "controversy" in § 9613(b).

diction in the federal discovery statute at issue in this case. *Supra* at 704–709. Through the enactment of 42 U.S.C. § 9658, Congress has expressed a singular interest in plaintiffs who possess only state environmental claims, and it has taken an affirmative step to ensure that such parties are not deprived "of their day in court" to assert their state claims. H.Conf.Rep. No. 962, 99th Cong., 2d Sess. 261, *reprinted in* 1986 U.S.Code Cong. & Admin.News 3276, 3354; H.Rep. No. 253(I), 99th Cong., 2d Sess. 105, *reprinted in* 1986 U.S.Code Cong. & Admin.News 2835, 2887. Indeed, in a limited respect, Congress has "federalized" state law as it relates to recovery for injuries caused by the release of hazardous substances: such state environmental claims are "controversies arising" under CERCLA, as well as state law, because it is the federal statute that defines when they accrue.[30] The significance of § 9658, therefore, is that it evinces a unique intent to involve the federal government, including its courts, in matters that were once exclusively within the domain of the states.

■ Finally, the court is aware of only two other courts to have had occasion to consider this issue, both of which have found pendent party jurisdiction to exist under the CERCLA statute. *United States v. A & N Cleaners & Launderers, Inc.*, 747 F.Supp. 1014 (S.D.N.Y.1990); *New Jersey Dep't of Envtl. Protection v. Gloucester Envtl. Management Servs.*, 719 F.Supp. 325 (D.N.J.1989). The court therefore concludes that Congress has affirmatively granted pendent party jurisdiction to the federal district courts for CERCLA actions.

**30.** Granted, § 9658 would appear to apply also to state claims filed in state court. But if one were to assume the unconstitutionality of § 9658 as applied to state environmental claims brought in *state* court, while leaving this statute intact as a procedural rule of the federal forum, *see supra* note 13, then the ability of plaintiffs to bring their state claims in federal court takes on added significance in fulfilling the express congressional purpose.

**31.** The court notes that a jury trial is available to plaintiffs only for their state claims, whereas the CERCLA action for recovery of response costs must be tried to the court. *See, e.g., Unit-*

■ The court also finds that the constitutional and discretionary factors present little impediment to the exercise of jurisdiction over the plaintiff children's state claims. These state claims derive from the same circumstances giving rise to the state and federal claims of the homeowners, and the children allege similar injuries as the parents.[31] Thus, even assuming the plaintiff children's federal claims are insubstantial—or for that matter, wholly absent—the court concludes that it has subject matter jurisdiction over these pendent parties' state claims.

## IV. *Emotional Distress*

Defendant's final ground for partial summary judgment is that no plaintiff to this action may recover damages for emotional distress. Plaintiffs seek compensatory damages for diminished property value, for out-of-pocket expenses, and "for annoyance, discomfort, inconvenience and peace of mind (emotional distress)." Doc. 94, at 8. Because no plaintiff alleges any personal injury from their exposure to TCE, defendant contends that plaintiffs have no claim for emotional distress damages.

■ The Kansas Supreme Court has long held that "there can be no recovery for emotional distress caused by the negligence of another unless accompanied by or resulting in physical injury." *Humes v. Clinton*, 246 Kan. 590, 598, 792 P.2d 1032, 1038 (1990) (citing cases). In all cases of negligent infliction of emotional distress, it is required that there be a " 'physical impact': an actual physical injury to the plaintiff." [32] *Anderson v. Scheffler*, 242 Kan.

*ed States v. Northern Pharmaceutical & Chem. Co.*, 810 F.2d 726, 749 (8th Cir.1986), *cert. denied*, 484 U.S. 848, 108 S.Ct. 146, 98 L.Ed.2d 102 (1987); *Commerce Holding Co. v. Buckstone*, 749 F.Supp. 441, 447 n. 4 (E.D.N.Y.1990). Although some courts have declined pendent jurisdiction on these grounds, *see Dublin Scarboro Improvement Ass'n v. Harford County*, 678 F.Supp. 129, 132 (D.Md.1988), the court perceives nothing unwieldy or burdensome in a common trial to court and jury for all federal and state claims.

**32.** Plaintiffs make no attempt to argue that the physical invasion of their bodies with TCE is a sufficient "physical impact" or injury under

857, 860, 752 P.2d 667 (1988). The only exception to the requirement of a physical personal injury relates to that narrow class of cases "where the act is wanton or willful or where the act is committed with malice and intended to cause mental distress." *Bowman v. Doherty*, 235 Kan. 870, 876, 686 P.2d 112 (1984). *See also Hoard v. Shawnee Mission Medical Center*, 233 Kan. 267, 274, 662 P.2d 1214, 1220 (1983). The Kansas Supreme Court has also made clear that the physical injury must be to a person and not to that person's property:

> Some courts in other jurisdictions have allowed recovery for emotional distress where there has been direct injury to property. These courts have allowed a contemporaneous injury to or interference with property to be regarded as a substitute for the physical impact required under the general rules.... We, however, have never allowed recovery under such circumstances.

*Hopkins v. State*, 237 Kan. 601, 612–13, 702 P.2d 311, 330 (1985) (citation omitted). *See also Maxedon v. Texaco Producing, Inc.*, 710 F.Supp. 1306, 1311 (D.Kan.1989) (dismissing claim for "aggravation and harassment" caused by saltwater and oil pollution where only damage was to land).

Nonetheless, plaintiffs argue that their causes of action of trespass, "wanton conduct," and nuisance do not demand a personal, physical injury for the recovery of emotional distress damages, and that the general principles therefore have no application in the present case. As to the claims of trespass and "wanton conduct," plaintiffs contend that these torts involve "intentional conduct" for which there is no requirement of a physical injury to the person. Although it is true that these are torts of intent, it is unnecessary to support the claimed damages with independent torts. In Kansas, the allegation of "intentional or reckless infliction of emotional distress" states the independent tort of outrage recognized by the court in *Dawson v. Associates Financial Servs. Co.*, 215 Kan. 814, 820, 529 P.2d 104 (1974).

The four elements of the tort of outrage were set forth in *Moore v. State Bank of Burden*, 240 Kan. 382, 729 P.2d 1205 (1986), *cert. denied*, 482 U.S. 906, 107 S.Ct. 2484, 96 L.Ed.2d 376 (1987):

> (1) The conduct of the defendant must be intentional or in reckless disregard of the plaintiff; (2) the conduct must be extreme and outrageous; (3) there must be a causal connection between the defendant's conduct and the plaintiff's mental distress; and (4) the plaintiff's mental distress must be extreme and severe.

*Id.* at syl. ¶ 3. Plaintiffs allege that wanton conduct "abounds" in this case, citing specific examples. Assuming the existence of such conduct, plaintiffs have stated no facts to suggest that they have suffered an "extreme" or "severe" mental distress from the knowledge of being exposed to TCE. *See Caplinger v. Carter*, 9 Kan. App.2d 287, 292, 676 P.2d 1300 (1984) (threshold requirement for tort of outrage is that plaintiff have suffered extreme and sever emotional distress), *review denied*, 235 Kan. 1041 (1985). Plaintiffs have failed to make any showing sufficient to establish the existence of this essential ele-

---

Kansas law to support their claim of damages for emotional distress. *See Werlein v. United States*, 746 F.Supp. 887, 901 (D.Minn.1990) (recognizing "subcellular harm" theory for exposure to TCE); *Eagle–Picher Indus., Inc. v. Cox*, 481 So.2d 517, 526–28 (Fla.Dist.Ct.App.1985) (inhalation of asbestos fibers satisfies "impact" rule for purposes of supporting damages for emotional distress), *review denied*, 492 So.2d 1331 (1986); *see also Hough v. Atchison, Topeka & Santa Fe Ry. Co.*, 133 Kan. 757, 762, 3 P.2d 499 (1931) (internal injuries physical in nature may support damages for emotional distress); *Silkwood v. Kerr–McGee Corp.*, 485 F.Supp. 566, 593–94 (W.D.Okl.1979), *aff'd and rev'd in part on other grounds*, 667 F.2d 908 (10th Cir.1981),

*rev'd on other grounds*, 464 U.S. 238, 104 S.Ct. 615, 78 L.Ed.2d 443 (1984); *but see Payton v. Abbott Labs.*, 386 Mass. 540, 437 N.E.2d 171, 181 (1982) (physical harm causing emotional distress must be a harm that is manifested by objective symptomology); *Anderson v. W.R. Grace & Co.*, 628 F.Supp. 1219, 1226–27 (D.Mass.1986) (rejecting under Massachusetts law "subcellular harm" as basis for physical harm supporting emotional distress damages). Nor do plaintiffs argue that Kansas would recognize a "threat of future physical danger theory" under these circumstances. *See Anderson*, 628 F.Supp. at 1230–31; *Wilson v. Key Tronic Corp.*, 40 Wash.App. 802, 701 P.2d 518, 524 (1985).

ment, *see Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986), and the court therefore finds that no plaintiff has stated a claim for intentional infliction of emotional distress.

Plaintiffs also contend that the cause of action of nuisance requires no physical injury to a plaintiff's person in order to recover damages for "emotional distress." In support, plaintiffs rely on *Davis v. City of Kansas City,* 204 Kan. 524, 464 P.2d 154 (1970). The plaintiffs in *Davis* were the owners of a house next to which the defendant city built a garbage dump. Although plaintiffs did not claim any physical injuries from defendant's activities, the various elements emanating from the dump created certain unpleasant conditions on plaintiffs' property that one might anticipate from such a structure. Addressing the defendant's challenge to the trial court's jury instruction for damages, the court stated:

> [Plaintiffs] should be allowed such amount as would fairly and adequately compensate them for the diminution in the value of their real estate during the three-month period immediately prior to [the date of filing], if any is shown, due to a nuisance created, maintained or permitted by the city, *and for such amounts as would fairly and adequately compensate each of the four plaintiffs for their annoyance, discomfort, inconvenience and endangerment of their health and peace of mind during said period of time, and due to such nuisance.*

*Id.* at 529–30, 464 P.2d at 158 (emphasis added). From this statement plaintiffs infer that Kansas nuisance law allows recovery of damages for "emotional distress" even in the absence of a physical injury to the plaintiff's person.

Defendant goes to some lengths to reconcile *Davis* with the well-established rule precluding damages for negligent infliction of emotional distress unless accompanied by some physical injury to the plaintiff's person. Defendant posits that *Davis* can be explained as an example of "intentional or reckless" infliction of emotional distress,[33] which is the only recognized exception to the general rule that demands an attending physical injury. The "explanation" for the damages awarded in *Davis,* however, lies elsewhere.

The parties confuse the distinction between damages for emotional distress, which redress an injury to the person, and damages for interference with the *property interest* of comfortable use and enjoyment of land. The essence of this property interest is stated in the law of nuisance.

> A nuisance is an annoyance, and any use of property by one which gives offense to or endangers life or health, violates the laws of decency, unreasonably pollutes the air with foul, noxious odors or smoke or *obstructs the reasonable and comfortable use and enjoyment of the property of another* may be said to be a nuisance.

*Culwell v. Abbott Constr. Co.,* 211 Kan. 359, 506 P.2d 1191, syl. ¶ 1 (1973) (emphasis added). Although it is the injured rights of *persons* for which the law of nuisance provides a remedy, these rights may exist "in person, property, or *enjoyment of property or comfort,* ...." *Delight Wholesale Co. v. City of Overland Park,* 203 Kan. 99, 453 P.2d 82, syl. ¶ 2 (1969) (emphasis added). By characterizing plaintiffs' claimed psychic injuries only as "emotional distress," the parties fail to appreciate the separate and distinct interest that is compensated through an award of damages for interference with the enjoyment of property.

█ Despite defendant's attempt to dismiss *Davis* as an anomaly, its award of damages for an injury to the plaintiffs' enjoyment of their land was by no means unprecedented. In *Klassen v. Central Kansas Co-op. Creamery Ass'n,* 160 Kan. 697, 165 P.2d 601 (1946), plaintiff was a tenant farmer whose stream had been pol-

---

**33.** Defendant's attempt to bring *Davis* within the terms of the tort of outrage contradicts defendant's own assertion that no Kansas case has actually allowed recovery under this theory since it was recognized in *Dawson v. Associates Financial Servs. Co.,* 215 Kan. 814, 820, 529 P.2d 104 (1974).

luted by waste products from defendant's creamery plant. Plaintiff had sustained no personal injury yet sought compensatory damages for the decreased production of his farm and separate compensatory damages for the "obnoxious odor" to which he and his family were subjected. Defendant argued that plaintiff had failed to prove any economic loss or damage resulting from the odor, and that such a loss was a necessary predicate for recovery based on this condition. The court unambiguously rejected this argument:

> It is not necessary to enable one to recover damages for the maintenance of a nuisance such as this that he be compelled to call a doctor or expend money for medicine. Members of the public have a right to be free from such an annoyance and whoever invades this right may be compelled to respond in damages.

*Id.* at 708, 165 P.2d at 608. *See also Jeakins v. City of El Dorado*, 143 Kan. 206, 53 P.2d 798 (1936) (overruling defendant's demurrer to plaintiff's petition claiming damages for exposure to "foul and obnoxious odors"). The court therefore finds that Kansas allows recovery of damages for the interference with the reasonable and comfortable use and enjoyment of land, irrespective of any physical injury to the plaintiff's person or of any consequential economic injury.

A question remains, however, whether damages for an impairment of this psychic interest are recoverable in addition to plaintiffs' claim of permanent damages for decreased property value. The Kansas Supreme Court does not appear to have directly addressed the issue but has indicated *in dicta* that damages for an injury to the plaintiff's use and enjoyment of land are separate from any award for permanent diminution in property value:

> [W]here the injury to real property caused by the nuisance is of a permanent character, the damages are measured by the depreciation in the market value of the property injured, taking into consideration, however, that *recovery is not limited solely to the damages to the property, but that special damages*

*arising from annoyance, discomfort, or inconvenience to the person may also be recovered.*

*Adams v. City of Arkansas City*, 188 Kan. 391, 399, 362 P.2d 829 (1961) (emphasis added) (quoting, without necessarily adopting, Annotation, *Damages to land as affected by permanence of nuisance*, 40 A.L.R.2d 1200). *See also Filisko v. Bridgeport Hydraulic Co.*, 176 Conn. 33, 404 A.2d 889 (1978) (upholding award of $34,000 for annoyance and discomfort in addition to $14,000 for permanent property damage); *Radcliff Homes, Inc. v. Jackson*, 766 S.W.2d 63, 66 (Ky.Ct.App.1989) (discomfort from diminished use and enjoyment is separate element of damages); *Wilson v. Key Tronic Corp.*, 40 Wash.App. 802, 701 P.2d 518, 525 (1985). In contrast to this statement is the view expressed by those states that consider the use and enjoyment of land to be an interest subsumed within the property value, and that accordingly preclude separate recovery on these two interests. *See Milan v. City of Bethlehem*, 372 Pa. 598, 610–11, 94 A.2d 774, 779 (1953); *Vestal v. Gulf Oil Corp.*, 149 Tex. 487, 235 S.W.2d 440, 442 (1951). One explanation for this latter rule is the notion that use and enjoyment is a separate possessory right only in the case of a tenancy, but that this right merges with the larger interest in land when the occupier of the property is also its owner. *Milan*, 372 Pa. at 608, 94 A.2d at 778. Other courts apparently consider diminished use and enjoyment of land to be only a temporary injury, which is valuated according to the property's decreased rental value accruing within the statute of limitation. *See Statler v. Catalano*, 167 Ill. App.3d 397, 118 Ill.Dec. 283, 289, 521 N.E.2d 565, 571, *appeal denied*, 122 Ill.2d 595, 125 Ill.Dec. 237, 530 N.E.2d 265 (1988); *Pate v. City of Martin*, 614 S.W.2d 46, 48 (Tenn.1981); *Etex Tel. Coop. v. Sanders*, 607 S.W.2d 278, 280–81 (Tex.Civ.App.1980). In other words, these courts have equated "loss of use and enjoyment" with the decreased rental value recoverable in an action for temporary damages. *See supra* at 698–99.

■ Neither of these views is reflected in the Kansas cases. In *Davis*, the plaintiffs were the owners as well as occupiers of the house, yet the court approved of a jury instruction that directed consideration of damages both for the diminution in the value of their property and for their annoyance and discomfort. 204 Kan. at 529–30, 464 P.2d at 158. Moreover, because *Davis* allowed recovery for a three-month, temporary diminution in the value of real estate,[34] in addition to damages for "annoyance," the case recognizes a distinction between decreased enjoyment of land and temporary decreased rental value. The holding of *Klassen* resolves any lingering uncertainty as to the separate nature of damages for permanent diminution in property value and damages for impaired use and enjoyment of the property. *Klassen* expressly recognized that a person's interest in the reasonable use and enjoyment of land, although not capable of precise quantification, is nonetheless a compensable property interest distinct from any economic loss occasioned by an interference with this right. 160 Kan. at 708, 165 P.2d at 608. The court therefore concludes that plaintiffs have stated a cognizable damages claim under Kansas law for impairment of the use and enjoyment of property, and that such damages are recoverable in addition to the alleged permanent diminution in property value.

■ This is not to say that all plaintiffs in this action may recover for lost use and enjoyment of the land. The distinction between "private" and "public" defines the parties and interests that are implicated in nuisance actions.

Private nuisance historically has been and is a tort related to an unlawful interference with a person's use or enjoyment of his land. *The concept of a private nuisance does not exist apart from the interest of the landowner.* Hence a private nuisance is a civil wrong, based on a disturbance of *some right or interest in land.*

*Culwell v. Abbott Constr. Co.,* 211 Kan. 359, 362, 506 P.2d 1191 (1973) (emphases added) (finding no private nuisance action where plaintiff had no ownership of an interest in land). *See also Sandifer Motors, Inc. v. City of Roeland Park,* 6 Kan. App.2d 308, 314, 628 P.2d 239 (1981); *Klassen,* 160 Kan. at 705, 165 P.2d 601 (tenant may recover damages for interference with enjoyment of land only for injuries occurring prior to lawful possession; quoting 46 C.J. 738). Thus, at least with respect to the private nuisance cause of action, only the plaintiff homeowners have stated a claim for damages resulting from the violation of their interest in the enjoyment of their land. Although the children may have suffered "emotional distress," this personal injury is not synonymous with the injury to the property interest sustained the homeowners. Because the plaintiff children have no legal interest in the subject land, they may not recover damages under a private nuisance theory for any impairment of the use and enjoyment of their parents' land.

■ Plaintiffs also seek to maintain a public nuisance cause of action.

Public nuisance comprehends a miscellaneous and diversified group of minor criminal offenses based on some interference with the interest of the community, or the comfort or convenience of the general public. To be considered public, the nuisance must affect an interest common to the general public, rather than peculiar to one individual or only a few.

. . . .

. . . . Stated in another way, a public nuisance is one which annoys a substantial portion of the community.

*Culwell,* 211 Kan. at 362 & 363, 506 P.2d 1191. Unlike a private nuisance, a public nuisance may exist even if the plaintiff has no property interest in the place of the nuisance. That is, a public nuisance action requires only that the nuisance be in a place where the public has a right to go and in fact does go. *State v. Rabinowitz,*

---

**34.** At the time of the *Davis* lawsuit, plaintiffs' action for temporary damages was governed by the three-month period of limitation for claims against a city. K.S.A. § 12–105, *repealed,* 1979 Kan.Sess. Laws 905.

85 Kan. 841, 847, 118 P. 1040 (1911); *City of Burlington v. Stockwell*, 5 Kan.App. 569, 47 P. 988 (1897). Although an action for public nuisance may generally be maintained only by the state, an exception to this limitation exists if a private party has sustained a "peculiar individual injury" that is distinguishable from the inconvenience or threat of injury to which the general public is exposed. *Culwell*, 211 Kan. at 364, 506 P.2d 1191. The difficulty is often in determining whether the plaintiff has suffered a "peculiar damage" sufficient to support a private action for the public nuisance. *Id.*

Assuming, without deciding, that the facts of this case could support a public nuisance action, the court nonetheless finds plaintiffs' injuries to be indistinguishable from those sustained by other members of the public. The nuisance in this case is not a nuisance that pervades the very atmosphere of plaintiffs' community, impairing health or inconveniencing persons who pass along the streets of the neighborhood. *Cf. City of Kansas City v. Sihler Hog Cholera Serum Co.*, 87 Kan. 786, 125 P. 70 (1912). Rather, the presence of TCE in the groundwater underlying plaintiffs' property can be considered a nuisance only insofar as a person is exposed to this water. The facts submitted by the parties reveal that such exposure resulted only from the use of the wells on the plaintiffs' property. Thus, the only harm or damage that results from the presence of TCE in the plaintiffs' groundwater is one shared by all persons exposed to this nuisance. Because no "special damage" can be shown, no plaintiff may maintain a private action under a public nuisance theory. This conclusion renders it unnecessary to consider whether damages for interference with the use and enjoyment of land in which a plaintiff has no possessory interest might be recoverable by private parties who bring a public nuisance action.

## V. *Conclusion*

The court finds that all state claims are timely under the Kansas limitations period by virtue of 42 U.S.C. § 9658, and that § 9658 is a valid enactment under the authority of the commerce clause. The court also finds that the plaintiff children have stated a cognizable federal claim under CERCLA for recovery of costs incurred in groundwater testing. The plaintiff children have failed, however, to state any claim for recovery of damages for either emotional distress or for the impaired use and enjoyment of land. Because these are the only state claims raised by these plaintiffs, the court will dismiss all state claims of the plaintiff children. Furthermore, because the court has determined that it has jurisdiction over the children's state law claims, this dismissal will be with prejudice. Finally, the court finds that the plaintiff homeowners have stated no claim entitling them to recover damages for emotional distress, but that these plaintiffs may recover damages for the interference with the reasonable and comfortable use and enjoyment of their land.

IT IS BY THE COURT THEREFORE ORDERED that defendant's motion (Doc. 86) to dismiss all state claims herein as alleged by plaintiffs Ty Caldwell, Cary Dene Harris, Fonda Denee Harris, Douglas Long, Duwayna Ramsey, Loren Robinson, Cassie Vosburg, and Jay Vosburg be granted. Defendant's motion to dismiss the federal claims of these same plaintiffs is hereby denied.

IT IS FURTHER ORDERED that defendant's motion (Doc. 86) to dismiss as untimely the state claims of the remaining plaintiffs to this action be denied.

IT IS FURTHER ORDERED that defendant's motion (Doc. 86) to dismiss all claims for emotional distress be granted.